RANDY S. GROSSMAN
Acting United States Attorney
Brandon J. Kimura
Assistant U.S. Attorney
California State Bar No.: 241220
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-9614
brandon.kimura@usdoj.gov
Attorneys for the United States

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 21-cr-01817-TWR |
| Plaintiff, | |
| v. | **UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT** |
| ERICK VOSTOK BERNAL, | |
| Defendant. | |

Defendant Erick Vostok Bernal (Defendant), facing his third consecutive criminal conviction before this Court for virtually the same behavior, now moves to dismiss Count 1 of the Indictment charging him with Attempted Re-entry of a Removed Alien. Defendant puts forth a well-worn argument that has been repeatedly denied, that the immigration laws of the United States, in this case Title 8, U.S.C. § 1326, is unconstitutional because it was enacted with a discriminatory purpose and has a disparate impact. Because neither the cited case-law nor the underlying evidence support his claim, this Court should join its sister courts in denying his motion.

//

//

//

//

# **TABLE OF CONTENTS**

Page

Introduction .................................................................................................. 1

Statement of Facts ........................................................................................ 1

Argument ...................................................................................................... 3

I. Section 1326 Became Law Through the Immigration and Nationality Act
   of 1952 ...................................................................................................... 5

II. Section 1326 Satisfies Rational-Basis Review .......................................... 8

   A. Section 1326 Is Subject to Only Rational-Basis Review, Not an
   *Arlington Heights* Analysis .................................................................... 8

   B. Section 1326 Has a Rational Basis ........................................................ 11

III. *Arlington Heights* Does Not Apply ......................................................... 12

IV. Even Under an *Arlington Heights* Analysis, Defendant Fails To
   Establish That § 1326 Violates Equal Protection ..................................... 14

   A. The Pertinent Legislative History Is That of the 1952 INA, Not 1920s
   Immigration Laws ................................................................................... 15

   B. Legislative History Demonstrates Legitimate Reasons for § 1326 .......... 16

   C. In Any Event, Congressional Motives Behind an Earlier, Repealed Law Are
   Irrelevant ................................................................................................ 19

   D. Defendant Fails To Establish Discriminatory Impact or Any Resulting
   Discriminatory Intent ............................................................................. 21

Conclusion .................................................................................................... 23

# **INTRODUCTION**

The Court should deny Defendant's motion to dismiss the Indictment.  He argues that 8 U.S.C. § 1326 violates the Equal Protection Clause of the Fifth Amendment under *Village of Arlington Heights v. Metropolitan Development Corp.*, 429 U.S. 252 (1977). It does not.

First, § 1326 is subject to only rational-basis review—not an *Arlington Heights* inquiry—and easily passes this test.  The Court of Appeals for the Ninth Circuit and at least two district courts, including this Court, already have concluded that § 1326 satisfies the low rational-basis threshold.  Second, even if the Court were to examine the illegal-reentry statute under *Arlington Heights*, Defendant fails to meet his burden to show a discriminatory purpose underlying this law because, among other reasons, he focuses on immigration laws from the 1920s while offering no argument or evidence relating to the specific legislative action he challenges:  the Immigration and Nationality Act of 1952, which brought § 1326 into law.  Defendants in several other cases have brought the same equal-protection challenge Defendant asserts here, and in all of those cases, the courts have rejected it.  Defendant's motion should be denied.

# **STATEMENT OF FACTS**

## **I.    Attempted Entry**

On May 30, 2021, at approximately 5 p.m. Defendant attempted to enter the United States through the San Ysidro Port of Entry – Pedestrian Lanes. *See* Exh. 1, Entry ROIs at 1. At the Port Limit Line, a Customs and Border Protection Officer (CBPO) contacted Defendant while conducting routine document verification for US citizens and LPRs. *Id*. Defendant informed the CBPO that he was born in Los Angeles, California. *Id*. Because there was nothing to contradict his statement, the CBPO allowed Defendant to continue to the Primary Inspection area. *Id*.

At the Primary Booth, Defendant informed the CBPO that he did not have travel documents, but claimed United States citizenship. *Id*. at 2. When asked for his name and date of birth, he stated his name was "Razo Ruben" and that his date of birth was

1

September 24, 1984. *Id*. The CBPO obtained two negative declarations for Defendant and then asked him where he was going. *Id*. He stated he was going to Baldwin Park. *Id*. Defendant was then sent to Secondary Inspection to be fingerprinted due to his lack of travel documents. *Id*.

Once at the Secondary Inspection area, Defendant again claimed to have been born in Los Angeles. *Id*. at 3. Fingerprints later revealed his true identity and prior arrests. *Id*. They included multiple convictions in this Court for attempted entry after deportation, false statement, and assault. *See* 15CR199-JLB; 16CR1072-JAH.

Defendant was arrested, advised of his *Miranda* rights, waived those rights and made a statement. *Id*. at 5. Defendant admitted to being a citizen of Mexico with no right to enter or remain in the United States, and that his intended destination was Baldwin Park, California. *Id*. at 5-6. He also admitted he had been arrested and had been ordered deported multiple times. *Id*. at 6.

## II.   **Assault**

On May 31, 2021, at approximately 7 a.m. officers transporting Defendant to the MCC found him uncooperative. *See* Exhibit 2, Assault ROIs. Defendant physically resisted officers' attempts to remove him from the cell and he struggled with officers as they attempted to put him into restraints. *Id*.

While waiting to be processed into the MCC, Defendant began yelling "help." *Id*. at 5. Because of this, Defendant was brought to the front of the line where a Bureau of Prisons nurse (W.M.) began a medical interview. *Id*.

Surveillance video recorded what happened next. *See* Exhibit 3, Assault Video. It shows Defendant being brought forward to the front of the line. *Id*. at 16:48. For over 3 minutes, Defendant appears calm and compliant while W.M. works on the medical evaluation. *Id*. at 16:48-19:19. Then, without any warning, Defendant lunged forward, crashing into W.M. with his forehead, driving her several feet backwards and knocking her off her feet. *Id*. 19:20-19:24.

W.M. sought medical attention. *See* Exh. 4, Injury Assessment. The attack injured W.M., causing swelling and pain in her face. *Id*.

On June 1, 2021, Defendant made his initial appearance and was arraigned on a Complaint charging Attempted Entry after Deportation in violation of 8 U.S.C. § 1326. Dkt. 3. On July 8, 2021, Defendant was arraigned on a two-count Indictment for Attempted of Reentry of a Removed Alien, in violation of 8 U.S.C. § 1326 (a) and (b); and Assault on a Federal Officer, in violation of 18 U.S.C. § 111 (a) and (b). Dkt. 22. A motion hearing was set for August 20, 2021. *Id*.

On August 6, 2021, Defendant filed a Motion to Dismiss the Indictment. Dkt. 28. This Response follows.

## ARGUMENT

Defendant asserts that § 1326 is constitutionally invalid under *Village of Arlington Heights v. Metropolitan Development Corp.*, 429 U.S. 252 (1977), because, although the statute is facially neutral, it has a discriminatory purpose and disparately impacts a disfavored group. (Def.'s Mot. at 2-4.) He relies on certain historical and legislative evidence relating to the Immigration Act of 1924, Pub. L. No. 68-139, 43 Stat. 153, Ch. 190, and a 1929 Act known as the Undesirable Aliens Act of 1929, Pub. L. No. 70-1018, 45 Stat. 1551, Ch. 690, which made reentry after deportation a felony punishable by up to two years in prison, to argue that racism against Mexicans underlies § 1326 and that this statute disparately impacts Mexican and Latinx defendants.

Defendant is mistaken. First, as a threshold matter, the statute at issue is not any immigration law from the 1920s, but § 1326—and § 1326 was enacted more than 20 years later as part of the Immigration and Nationality Act of 1952 ("INA"), Pub. L. No. 82-414, 66 Stat. 163, Ch. 477, codified at 8 U.S.C. § 1 *et seq.*

Second, *Arlington Heights* does not apply here, and Defendant cites no authority for its application in a criminal immigration case like this one. The cases he does cite do not lend him the support he claims. Rather, immigration laws are subject to rational-basis review at most, and § 1326 easily satisfies this highly deferential standard of

review, as the Court of Appeals for the Ninth Circuit, courts in this District, and a district court in the Eastern District of Virginia already have concluded. *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998); Order, *United States v. Palacios-Arias*, No. 3:20-CR-62-JAG (E.D. Va. Oct. 13, 2020), Dkt. No. 37 (finding § 1326 satisfies rational basis review, and that "[f]or the sake of thoroughness, even if the Court agreed with the defendant and applied the heightened scrutiny that *Arlington Heights* calls for, the defendant's challenge to § 1326 would still fail.").

Several courts in this District have denied other defendants' equal-protection challenges to § 1325 and further demonstrate the flaws in Defendant's arguments here. *United States v. Gallegos-Aparicio*, No. 19-CR-2637-GPC, at *2-*4 (S.D. Cal. Dec. 11, 2020); *United States v. Rios-Montano*, No. 19-CR-2123-GPC, 2020 WL 7226441, at *2-*8 (S.D. Cal. Dec. 8, 2020); *United States v. Lucas-Hernandez*, No. 19-MJ-24522-LL, 2020 WL 6161150, at *2-*4 (S.D. Cal. Oct. 21, 2020); *United States v. Lazcano-Neria,* No. 20-MJ -04538-AHG, 2020 WL 6363685, at *8-*9 (S.D. Cal. Oct. 29, 2020); *United States v. Ruiz-Rivera*, No. 20-MJ-20306-AHG, 2020 WL 5230519, at *2-*5 (S.D. Cal. Sept. 2, 2020).[1]

Defendant highlights one of those cases – Judge Curiel's decision in a § 1325 case, *United States v. Rios-Montano*, 19-CR-2123-GPC – as if the § 1326 charge in this case presents this Court with an issue of first impression. Meanwhile, courts in this District – including this Court – have denied motions to dismiss § 1326 charges on equal-protection grounds identical to the motion Defendant brings here. *United States v. Navarrete-Castro*, No. 19-CR-2717-CAB (S.D. Cal. Nov. 19, 2020), Dkt. No. 70 (finding Section 1326 subject to deferential standard of review, law meets rational basis test, and defendant had not met burden to challenge the constitutionality of § 1326);

---

[1] Defendant writes, "To defense counsel's knowledge, only one judge in the Southern District of California has issued written orders in response to motions to dismiss under *Arlington Heights* based on the racially-discriminatory origins of the illegal entry laws. (Dkt. No. 31 at 4, fn. 6.) Notably, written decisions were issued in all of these cases, all of which involved defendants represented by Federal Defenders.

*United States v. Rodriguez-Barios*, 20-CR-1684-LAB (S.D. Cal. Oct. 21, 2020), Dkt. No. 33 (denying constitutional challenge to § 1326 applying rational basis test, finding defendant's argument to "dictate to Congress what discussion they must have before they enact a law" to be "a blatant violation of separation of powers");

Finally, even if this Court were to look at the history and motivations of § 1326 under *Arlington Heights*, Defendant's argument fails at least because (a) if any legislative history were to be analyzed, it should be that of the 1952 INA and subsequent amendments to § 1326, not the history relating to 1920s immigration laws; (b) the legislative history demonstrates legitimate reasons for establishing a criminal penalty for illegal reentry; (c) in any event, legislative motives behind an earlier, repealed law are not relevant to a later (although similar) statute enacted by a different Congress; and (d) Defendant does not show disparate impact or any resulting discriminatory motive. *See United States v. Jose Alberto Medina Zepeda*, 20-CR-0057-FMO (C.D. Cal. Jan. 5, 2021) (denying motion to dismiss § 1326 charge as unconstitutional without a hearing, applying *Arlington Heights* standard).

## III.   Section 1326 Became Law Through the Immigration and Nationality Act of 1952

Title 8 U.S.C. § 1326 is the codification of the illegal-reentry provision—§ 276—of the INA.   Only § 1326, not earlier immigration laws, is relevant to Defendant's motion.   However, because Defendant's motion addresses only laws from the 1920s, also set forth below is brief background on certain immigration laws predating the INA and § 1326.

The Immigration Act of 1917 established that an alien who, within three years after entry, entered the United States at any time or place other than as designated by immigration officials, or who entered without inspection, shall be deported.   Pub. L. No. 64-301, § 19, 39 Stat. 874, 889, Ch. 29.   There was no penalty for reentry other than deportation.

In 1929, the 70th Congress made reentry after deportation a felony offense punishable by up to two years in prison and up to a $1,000 fine.  Pub. L. No. 70-1018, 45 Stat. 1551, Ch. 690.  This was done to strengthen the deterrent effect of the immigration laws, as the Senate Report from the Committee on Immigration described. S. Rep. No. 70-1456 at 1 (Jan. 17, 1929) (noting that there was no law providing any penalty other than deportation for unlawful reentry, explaining that this legislation would make illegal reentry a felony offense punishable by up to two years' imprisonment and a $1,000 fine, which "is believed . . . would be of material aid in enforcing our immigration laws").  The Secretary of the Department of Labor—charged at that time with enforcing the country's immigration laws—agreed.  In a letter incorporated into the Senate Report, the Secretary stated that the proposed law "would be of material assistance in the administration of existing immigration laws[,]" explaining that "no prohibitive law can successfully be enforced without a deterrent penalty," and "[t]he fact that possible deportation is not a sufficient deterrent to discourage those who seek to gain entry through other than regular channels is demonstrated by the frequency with which this department is compelled to resort to deportation proceedings for the same alien on several succeeding occasions."  *Id.* at 2.

In 1952, the 82nd Congress[2] passed the INA, Pub. L. 82-414, 66 Stat. 163, Ch. 477.  The INA "revise[d] the laws relating to immigration, naturalization, and nationality" and expressly repealed the 1929 Act.  *Id.*, 82-414, Introduction, 66 Stat. 163, § 403(a)(30), 66 Stat. 279.  Section 276 of the INA was codified at 8 U.S.C. § 1326 and established the following felony offense for reentry of a deported alien—also punishable by up to two years in prison and a $1,000 fine:

> Any alien who—

---

[2] The 82nd Congress shared only 21 members (less than 4 percent) with the 70th Congress.  *See* Order at 7 n.8, *Palacios-Arias*, No. 3:20-CR-62, Dkt. No. 37.  In particular, the individuals Defendant cites in the context of the 1920s legislation, *see* Def.'s Mot. at 7-17, were either out of Congress (Albert Johnson, Patrick O'Sullivan, Robert Green, John Schafer) or dead (Coleman Blease, James Davis, John Box, Harry Laughlin) by 1952.

(1) has been arrested and deported or excluded and deported, and thereafter

(2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this or any prior Act,

shall be guilty of a felony, and upon conviction thereof, be punished by imprisonment of not more than two years, or by a fine of not more than $1,000, or both.

*Id.*, § 276, 66 Stat. 229, codified at 8 U.S.C. § 1326; *see also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 756 (9th Cir. 2018) (discussing history of immigration laws and the INA).

Congress has amended § 1326 a number of times, and it always has increased its deterrent value. *See* Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7345, 102 Stat. 4181, 4471 (100th Congress adding a subsection (b) to § 1326 and creating enhanced penalties for aliens with prior felony convictions); Immigration Act of 1990, Pub. L. No. 101-649, § 543(b)(3), 104 Stat. 4978, 5059 (increasing the fine levels; amending the fine provision so that a defendant convicted shall be fined under 18 U.S.C.); Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 130001(b), 108 Stat. 1796, 2023 (amending and increasing penalties under subsection (b)); the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, §§ 507(c), 438(b), 441 110 Stat. 1214, 1267-68, 1276, 1279 (among other things, limiting collateral attacks on deportation orders in § 1326 prosecutions); Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, §§ 241(b), 244(d)(3)(J), 334, 110 Stat. 3009-606, -618, -635 (among other modifications, striking "arrested and deported, has been excluded and deported," and inserting "denied admission, excluded, deported, or removed").

IV.   **Section 1326 Satisfies Rational-Basis Review**

A.   **Section 1326 Is Subject to Only Rational-Basis Review, Not an *Arlington Heights* Analysis**

Congress's immigration laws are subject to rational-basis review, not a searching inquiry under *Arlington Heights*.  Rational basis is a highly deferential standard that requires Defendant to negate every possible basis which might support § 1326.  He cannot do so.  Indeed, the Court of Appeals for the Ninth Circuit already has concluded that rational-basis review applies to equal-protection challenges to federal immigration laws and that § 1326 satisfies that test.

Congress has plenary power over immigration matters.  *Kleindeinst v. Mandel*, 408 U.S. 753, 766 (1972); *Hernandez-Guerrero*, 147 F.3d at 1076; *see also Catholic Soc. Servs. V. Reno*, 134 F.3d 921, 927 (9th Cir. 1998).  "Over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." *Hernandez-Guerrero*, 147 F.3d at 1076 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (internal quotation marks and citation omitted)).  Since at least the late 19th century it has been acknowledged that Congress has authority over immigration matters as an incident to sovereignty.  *Chae Chan Ping v. United States*, 130 U.S. 581, 609 (1889); *Hernandez-Guerrero*, 147 F.3d at 1076; *see Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909).

As a result, Congress's actions regarding immigration are "largely immune from judicial review."  *Fiallo*, 430 U.S. at 792.  Only "narrow judicial review" is permitted in this area.  *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 n.21 (1976); *see Trump v. Hawaii*, 138 S. Ct. 2392, 2419 (2018) ("deferential standard of review across different contexts and constitutional claims" regarding immigration matters); *Fiallo*, 430 U.S. at 792 ("it is important to underscore the limited scope of judicial inquiry into immigration legislation."); *id.* at 796 ("the reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization." (quoting *Mathews v. Diaz*, 426

U.S. 67, 81-82 (1976)).  This means that a court's analysis is limited to determining whether the challenged law is "facially legitimate and bona fide," and not "look[ing] behind the exercise of that discretion, nor test it by balancing its justification against [constitutional] interests[.]"  *Mandel*, 408 U.S. at 769, 770; *see Fiallo*, 430 U.S. at 795 (in an equal-protection case involving a law giving immigration preferences to mothers of "illegitimate" children, declining to apply "a more exacting standard than was applied in *Kleindeinst v. Mandel*, a First Amendment case").  "[I]t is not the judicial role in cases of this sort to probe the justifications for the legislative decision." *Fiallo*, 430 U.S. at 799; *see Trump v. Hawaii*, 138 S. Ct. at 2392.

Accordingly, the proper standard in cases involving challenges to federal immigration laws like this one is no more than rational-basis review—the "equivalent" of *Mandel*'s facially-legitimate-and-bona-fide-reason test.  *Ablang v. Reno*, 52 F.3d 801, 804 (9th Cir. 1995) (applying rational-basis review and finding that the Government "put forth facially bona fide and legitimate reasons" for requiring proof of paternity within a certain time limitation); *see Dent v. Sessions*, 900 F.3d 1075, 1081 (9th Cir. 2018) (stating that in immigration affairs, outside of citizenship claims, "[w]e have applied *Fiallo*'s standard and looked for only a 'facially legitimate and bona fide reason' to support a statutory distinction"); *Hernandez-Mancilla v. Holder*, 633 F.3d 1182, 1185 (9th Cir. 2011) ("We review equal protection challenges to federal immigration laws under the rational basis standard and uphold them if they are 'rationally related to a legitimate government purpose."); *Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1049 (9th Cir. 2017) (en banc) (for equal protection claims, "ordinary rational basis review is the appropriate standard in the immigration context").[3]

---

[3] In a concurring opinion in *Ledezma-Cosino*, three judges said that the Government's burden in the immigration context is "even lighter than rational basis:  We approve immigration laws that are facially legitimate without probing or testing possible justifications."  857 F.3d at 1050 (Kozinski, J., concurring).  And in *Hawaii*, the Supreme Court stated that "[a] conventional application of *Mandel*, asking only whether the policy is facially legitimate and bona fide, would put an end to our review."  138 S. Ct. at 2420. Nonetheless, at the government's suggestion, the Court went further to apply rational basis review to the immigration policy at issue.  *Id.*  Regardless of the precise standard of review, it can be no more than rational basis.

9

The Court of Appeals for the Ninth Circuit has applied just this standard in immigration-law challenges, including to criminal laws such as § 1326. *Hernandez-Guerrero*, 147 F.3d at 1078 (concluding that § 1326 is "well within Congress's sweeping power over immigration matters" and stating that "it is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite."); *see Hernandez-Mancilla*, 633 F.3d at 1185 (applying rational-basis review to, and upholding in light of an equal-protection challenge, 8 U.S.C. § 1229b's requirement that an alien be present in the United States for a continuous 10-year period in order to be eligible for cancellation of removal under rational-basis review); *United States v. Lopez-Flores*, 63 F.3d 1468, 1470, 1475 (9th Cir. 1995) (in equal-protection challenge to the Hostage Taking Act, holding that "[f]ederal legislation that classifies on the basis of alienage, enacted pursuant to Congress' immigration or foreign powers, is therefore subject to the lowest level of judicial review" and that the "classifications contained in the [Act] were clearly intended to serve Congress' legitimate foreign policy concerns."); *United States v. Ruiz-Chairez*, 493 F.3d 1089, 1091 (9th Cir. 2007) (applying rational-basis review to USSG § 2L1.2—the illegal reentry Sentencing Guideline—and upholding it: "Because the illegal reentry statute is a proper exercise of Congress's immigration power, and because § 2L1.2 properly implements this congressional directive, we must conclude that the 16 level enhancement in §2L1.2 serves a legitimate government interest and has a rational basis." (citations omitted)).[4]

---

[4] Section 1326 implicates only rational-basis review for the additional reason that aliens who have reentered the United States illegally are not a suspect class. "Undocumented aliens cannot be treated as a suspect class because their presence in this country in violation of federal law is not a 'constitutional irrelevancy.'" *Plyler v. Doe*, 457 U.S. 202, 223 (1982). And when a class "'do[es] not constitute a suspect class' for equal protection purposes, a governmental policy that purposefully treats the [class] differently from [non-class members] need only be 'rationally related to legitimate legislative goals' to pass constitutional muster." *Lee v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001) (quoting *Does 1-5 v. Chandler*, 83 F.3d 1150, 1155 (9th Cir. 1996)), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1125 (9th Cir. 2002). Thus, classifications that apply to aliens illegally present in

10

Rational-basis review means that a federal law must be upheld if it is "rationally related to a legitimate government purpose." *Hernandez-Mancilla*, 633 F.3d at 1185 (quoting *Masnauskas v. Gonzales*, 432 F.3d 1067, 1071 (9th Cir. 2005)); *see Ruiz-Chairez*, 493 F.3d at 1091. The statute is presumed constitutional, and the party challenging it has the burden "to negative every conceivable basis which might support it." *Heller v. Doe*, 509 U.S. 312, 320 (1993); *Hernandez-Mancilla*, 633 F.3d at 1185 (quoting *Masnauskas*, 432 F.3d at 1071); *Aleman v. Glickman*, 217 F.3d 1191, 1201 (9th Cir. 2000); *see Ruiz-Chairez*, 493 F.3d at 1091. The Government has no obligation to produce evidence supporting the statutory classification. *Heller*, 509 U.S. at 320; *Aleman*, 217 F.3d at 1201. This standard allows for "decisions based on rational speculation unsupported by evidence or empirical data" and does not require an "exact fit" between the challenged statute and governmental interest. *United States v. Navarro*, 800 F.3d 1104, 1114 (9th Cir. 2015) (citations and internal quotation marks omitted).

## B.     Section 1326 Has a Rational Basis

Section 1326 easily satisfies rational-basis review. Section 1326 operates as a regulatory statute to further the Government's legitimate interests in enforcing the immigration laws and controlling unlawful alien immigration. *Hernandez-Guerrero*, 147 F.3d at 1078 ("'§ 1326 is designed to effectively enforce the immigration laws.' It 'is a regulatory statute enacted to assist in the control of unlawful immigration by aliens.'") (citations omitted) (quoting *United States v. Barron-Rivera*, 922 F.2d 549, 555 (9th Cir. 1991), and *Pena-Cabanillas v. United States*, 394 F.2d 785, 788 (9th Cir. 1968), *abrogation on other grounds recognized by United States v. Castillo-Mendez*, 868 F.3d 830, 835-36 (9th Cir. 2017)). "[I]t is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—

the United States are subject to only rational-basis review. *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1065 n.4 (9th Cir. 2014); *United States v. Mendoza-Hinojosa*, 216 F.3d 1085, 2000 WL 429701, at *2 (Table) (9th Cir. 2000) (unpublished).

all bark and no bite." *Id.*  Indeed, a Virginia federal district court considered and rejected the same *Arlington Heights* equal-protection arguments that Defendant raises here and concluded that § 1326 satisfies rational basis review because

> The government undoubtedly has a legitimate interest in deterring illegal reentry into the United States.  Doing so increases the likelihood of compliance with deportation orders and promotes respect for the country's legal immigration process.  Moreover, the illegal reentry statute rationally relates to that interest by sanctioning those who disregard a previous deportation order.

Order at 4, *Palacios-Arias*, No. 3:20-CR-62-JAG, Dkt. No. 37.  As noted above, courts in this District also have rejected equal-protection challenges to § 1325, concluding that that statute passes the rational-basis test.  *See, e.g.*, *Lucas-Hernandez*, 2020 WL 6161150, at \*4; *Ruiz-Rivera*, 2020 WL 5230519, at \*4.[5]

## V.   *Arlington Heights* Does Not Apply

Defendant's reliance on *Arlington Heights* is misplaced.  As explained above, rational-basis review (at most) is the proper standard for this and other challenges to federal immigration laws, including criminal laws.  *Arlington Heights* also does not apply because the case and its framework arose in an entirely different context:  racial integration and discrimination in housing.  Plaintiffs there claimed that the denial of a rezoning request—from single- to multiple-family classification, for low- and moderate-income tenants, and for a development that would be racially integrated—was racially discriminatory in violation of the Equal Protection Clause of the Fourteenth Amendment.  429 U.S. at 254-60.  It did not involve immigration law or any other area of broad federal authority subject to simply rational-basis review.

---

[5] In two cases, a different court in this District has declined to apply rational-basis review in cases involving equal-protection claims against § 1325.  *Gallegos-Aparicio*, No. 19-CR-2637-GPC, at \*2-\*3; *Rios-Montano*, No. 19-CR-2123-GPC, 2020 WL 7226441, at \*1-\*2.  For at least the reasons set forth in this Response, rational-basis review should have been applied there.  In any event, and as discussed below, the court in *Gallegos-Aparicio* and *Rios-Montano* concluded that the defendants failed to meet their burden under *Arlington Heights* and thus denied their motions to dismiss indictments for violation of § 1325.  *Gallegos-Aparicio*, No. 19-CR-2637-GPC, at \*2-\*4; *Rios-Montano*, No. 19-CR-2123-GPC, 2020 WL 7226441, at \*2-\*8.

In addition, Defendant provides no authority for the application of *Arlington Heights* here. He cites no case in which a court applied anything more than rational-basis review to a federal immigration law. *Arce v. Douglas*, *see* Def.'s Mot. at 5, cited *Arlington Heights* in considering First- and Fourteenth-Amendment claims regarding an Arizona law that eliminated a Mexican American Studies program in Tucson public schools. 793 F.3d 968, 973, 977-81 (9th Cir. 2015). *Hunter v. Underwood*, *see* Def.'s Mot. at 5-6, applied *Arlington Heights* to a Fourteenth-Amendment equal-protection challenge to a provision of the Alabama state constitution that disenfranchised individuals convicted of a crime involving moral turpitude, among other offenses. 471 U.S. 222, 225-33 (1985). *Democratic National Committee v. Hobbs*, *see* Def.'s Mot. at 17, had to do with an Arizona law that prohibited third-party ballot collection and related claims based on the Voting Rights Act of 1965 and the First, Fourteenth, and Fifteenth Amendments. 948 F.3d 989, 998, 1038-42 (9th Cir. 2020) (en banc). And *Hunt v. Cromartie*, *see* Def.'s Mot. at 7 fn.8, involved a challenge to a North Carolina redistricting plan based on the Equal Protection Clause of the Fourteenth Amendment on the ground that it was an unconstitutional racial gerrymander. 526 U.S. 541, 546 (1999). None of these cases provides a basis for applying *Arlington Heights* or any standard higher than rational basis here.

Further, Defendant's attempt to use *Arlington Heights* to examine the allegedly improper reasons for § 1326 is contrary to the longstanding caution against probing into the Congress's motives. A court "will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968). The *O'Brien* Court also "eschew[ed]" the type of inquiry Defendant seeks here:

> Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. It is entirely a different matter when we are

asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it.  What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.  We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a "wiser" speech about it.

*Id.* at 384; *see also City of Erie v. Pap's A.M.*, 529 U.S. 277, 292 (2000) (rejecting an attempt to use a city attorney's statements to show what a public nudity ban was aimed at and stating, "this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit motive.") (citing *O'Brien*, 391 U.S. at 383)); *Menotti v. City of Seattle*, 409 F.3d 1113, 1130 n.29 (9th Cir. 2005) ("Even if plaintiffs could establish that the City had an illicit motive in adopting Order No. 3, that would not be dispositive.  The Supreme Court has held unequivocally that it 'will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.'") (quoting *O'Brien*, 391 U.S. at 383)); *City of Las Vegas v. Foley*, 747 F.2d 1294, 1297 (9th Cir. 1984) (citing *O'Brien* and the Supreme Court's "refus[al] to inquire into legislative motives" and noting the "hazard" of inquiring into legislative motives because "[i]ndividual legislators may vote for a particular statute for a variety of reasons").

Section 1326 is a lawful proscription against illegal reentry that plainly satisfies rational-basis review.  The Court's inquiry should end there.  And because—as a matter of law—Defendant cannot prevail on his motion, no evidentiary hearing should be held. *See United States v. Irwin*, 612 F.2d 1182, 1187 (9th 1980) (evidentiary hearing not required when the evidence "show[s] as a matter of law that [defendant] was or was not entitled to relief").

## VI.   Even Under an *Arlington Heights* Analysis, Defendant Fails To Establish That § 1326 Violates Equal Protection

Even if the Court were to apply *Arlington Heights* here, Defendant's argument fails for several reasons:  (a) if any legislative history were to be analyzed, it should be that of the INA and subsequent amendments to § 1326, not legislative history relating to

14

1920s immigration laws; (b) the legislative history demonstrates legitimate reasons for establishing a criminal penalty for illegal reentry; (c) in any event, legislative motives behind an earlier, repealed law are not relevant to a later (although similar) statute enacted by a different Congress; and (d) Defendant does not establish disparate impact or any resulting discriminatory motive.

### A. The Pertinent Legislative History Is That of the 1952 INA, Not 1920s Immigration Laws

Defendant's challenge to § 1326 relies entirely on certain historical evidence relating to immigration laws passed in the 1920s: the Immigration Act of 1924 and the Act of 1929. However, as discussed above, the INA of 1952 is what counts; that is the act that brought § 1326 into law. Defendant mentions the INA in passing, *see* Def.'s Mot. at 20, but completely ignores its legislative history. Defendant's *Arlington Heights* analysis therefore is "fatally flawed." *Lucas-Hernandez*, 2020 WL 6161150, at *2; *Ruiz-Rivera*, 2020 WL 5230519, at *3.

If any legislative history were appropriate to analyze, it would be that of the INA and subsequent amendments. *Arlington Heights* requires proof of discriminatory intent as to "the challenged action," *see Arlington Heights*, 429 U.S. at 265, which here is § 276 of the INA, codified at § 1326. *See Gallegos-Aparicio*, No. 19-CR-2637-GPC, at *5 (describing the requirement to prove discriminatory intent in "the challenged action"); *Rios-Montano*, No. 19-CR-2123-GPC, 2020 WL 7226441, at *7 (same). Defendant focuses instead on the Act of 1929, but, as several courts have concluded, the history of that law does not establish Congress's purpose(s) in passing the INA in 1952, let alone any discriminatory purpose behind § 1326. *See* Order at 5, *Palacios-Arias*, 3:20-CR-62-JAG, Dkt. No. 37 ("That history [of the Undesirable Aliens Act of 1929], however, d[oes] little to explain why Congress passed the [INA], the law that replaced the Undesirable Aliens Act of 1929 and that the defendant allegedly violated. To challenge the INA using *Arlington Heights*, the defendant must provide evidence that a discriminatory purpose motivated Congress to pass that law. He has not done so here.")

(citation omitted)); *Gallegos-Aparicio*, No. 19-CR-2637-GPC, at *4-*7 (rejecting defendant's challenge to § 1325; explaining that "*Arlington Heights* directs the Court to look at the motivation behind the official act being challenged" and "[t]he Court therefore must consider whether [defendant] has shown that Congress's *1990 enactment of Section 1325* was motivated at least in part by a discriminatory purpose"; and concluding that "the legislative history for the 1990 legislation does not reveal any discriminatory motive and provides no support for [defendant's] position") (emphasis added); *Rios-Montano*, No. 19-CR-2123-GPC, 2020 WL 7226441, at *7-*14 (same); *Lucas-Hernandez*, 2020 WL 6161150, at *2 ("Defendant's *Arlington Heights* analysis of § 1325(a)(1) is fatally flawed because it relies entirely on legislative history from the 1920s, decades before § 1325(a)(1) was enacted."); *Ruiz-Rivera*, 2020 WL 5230519, at *3 ("Defendant's *Arlington Heights* analysis of § 1325(a)(1) is fatally flawed, however, because it relies entirely on the legislative history of the UAA [Undesirable Aliens Act], a law that was enacted decades before.").

Defendant offers no argument or evidence relating to the history of and reasons for the INA.  His *Arlington Heights* analysis fails for this reason alone.

### B. Legislative History Demonstrates Legitimate Reasons for § 1326

Even if the Court were to examine legislative history, the history does not show that "racism and eugenics" were a "motivating factor" let alone a "primary factor" behind § 1326, as Defendant claims.  (Def.'s Mot. at 7.)  Rather, Congress appears to have been concerned with assisting in the enforcement of immigration laws.

The INA was "the final product of a most intensive and searching investigation and study over a three-year period."  *Pena-Cabanillas v. United States*, 394 F.2d 785, 790 (9th Cir. 1968), *abrogation on other grounds recognized by United States v. Castillo-Mendez*, 868 F.3d 830, 835-36 (9th Cir. 2017); *see also, e.g.*, Oscar M. Trelles, II and James F. Bailey, III, 1 Immigration and Nationality Acts:  Legislative Histories and Related Documents at iii (Introduction) (1979).  This comprehensive law not only revised but replaced previous immigration laws, including the 1929 Act.  Pub. L. 82-

16

1   414, Introduction, § 403(a)(30), 66 Stat. 163, 279.  Defendant has not identified any

2   allegedly discriminatory motives against Mexican or Latinx persons underlying the INA

3   or its illegal-reentry provision, § 276 (codified at 8 U.S.C. § 1326).

4          In recommending that the bill (H.R. 5678, which would become the INA) be

5   passed, the report of the House Judiciary Committee mentioned only the following with

6   respect to illegal reentry:

7               As in existing law, both administrative fines and civil and
8          criminal penalties are provided as an aid in the enforcement of
           the provisions of the bill.
                   . . .
9          [C]riminal sanctions are provided for entry of an alien at an
           improper time or place, for misrepresentation and concealment
10         of facts, for reentry of certain deported aliens, for aiding and
           assisting subversive aliens to enter the United States, and for
11         importation of aliens for immoral purposes.

12   H. Rep. 82-1365 at 67, 68.  This shows that the fundamental purpose of the penalties in

13   § 1326 was to assist the enforcement of immigration laws, as courts have recognized.

14   *See Hernandez-Guerrero*, 147 F.3d at 1078.  And this is the same purpose expressed for

15   the illegal-reentry penalties adopted in the 1929 Act.  *See* S. Rep. No. 70-1456 at 1-2

16   (Jan. 17, 1929); *supra* § I.

17          The INA also removed all racial bars to immigration and naturalization.  *See* Pub.

18   L. 82-414, §§ 201, 202, 311, 66 Stat. 163, 175-78; H. Rep. 82-1365 at 28.  Further, like

19   under the Immigration Act of 1924, *see* Pub. L. No. 68-139, § 4, 43 Stat. 153, 155, the

20   INA provided that individuals born in the Republic of Mexico—as well as those born in

21   Canada and several other countries—were not subject to immigration quotas, *see* Pub.

22   L. 82-414, § 101, 66 Stat. 163, 169 ("The term 'nonquota immigrant' means— . . . an

23   immigrant who was born in Canada, the Republic of Mexico, the Republic of Cuba, the

24   Republic of Haiti, the Dominican Republic, the Canal Zone, or an independent country

25   of Central or South America, and the spouse or the child of any such immigrant, if

26   accompanying or following to join him[.]").  This legislative history undercuts

27   Defendant's position that § 1326 was designed with the intent of discriminating against

28   Mexican and Latinx persons.

Even if legislative history relating to Act of 1929 were to be considered, that history is not as one-sided as Defendant portrays.  It shows that Congress at that time had broader concerns about economic issues and was not simply motivated by antipathy toward Mexican and Latinx persons, as Defendant claims.  For instance, Defendant states that Rep. Thomas Blanton "complained that Mexicans 'come into Texas by hordes[.]'"  (Def.'s Mot. at 16) (quoting Mot. Ex. C, 70 Cong. Rec. 3619 (1929)).  But a moment later, Rep. Blanton discussed the need to preserve jobs for America citizens, asserting that "They are taking away jobs from American citizens."  70 Cong. Rec. 3619 (1929).  Defendant also cites Rep. Blanton as "urg[ing] the House to 'apprehend the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep them there.'"  (Def.'s Mot. at 16) (quoting Mot. Ex. C, 70 Cong. Rec. 3619 (1929)).  Defendant omits the very next sentence, which again is tethered to jobs:  "Then you would not have the report coming in here from Austin, Tex., and many other places that many Americans are going to be without jobs[.]"  70 Cong. Rec. 3619 (1929).  Further, Defendant says Rep. Blanton "challenged others to visit the international ports of entry in Texas to see the 'hordes that come across the bridges with no intention of ever going back.'"  *Id.* (quoting Mot. Ex. C, 70 Cong. Rec. 3619 (1929)).  The very next words in that quoted passage—which has a comma after "ever going back," not a period as in Defendant's brief—are "coming across to get jobs of Americans[.]"  70 Cong. Rec. 3619 (1929); *see also id.* (stating that "it ought to be stopped, and if we do not do it we are going to have Americans starving to death in the Hoover administration.").

Defendant takes the same approach to two quotes from Reps. Schafer and Box. Defendant cites Rep. Schafer as saying, "[t]hese Mexicans also come into Wisconsin in droves[.]"  Def.'s Mot. at 16 (quoting Mot. Ex. C, 70 Cong. Rec. 3619 (1929)).  The full original quote is:  "These Mexicans also come into Wisconsin in droves, and take the places of American citizens in the factories and on the farm.  Often we see the spectacle of war veterans walking the streets unable to obtain employment because of the unfair

18

competition of cheap Mexican labor."  70 Cong. Rec. 3619 (1929).  And Defendant notes several startling comments of Rep. John Box, *see* Def.'s Mot. at at 10-17, who also commented during congressional debate about the issue of jobs for his constituents: "They do take the places of American workmen, who are already put to it to find jobs; in fact, there are hundreds of thousands, possibly millions, of Americans out of employment right now."  70 Cong. Rec. 3619 (1929).[6]

The point is not that these or other Congressmen did not say things or have opinions they shouldn't have.  The issue is that probing legislative history in the way Defendant seeks to do reveals a more complicated picture than he provides in his motion.  And the legislative history—especially when focusing on the INA—does not show discriminatory motive to support Defendant's equal-protection claim.  His *Arlington Heights* argument falls short for this additional reason.

## C.   In Any Event, Congressional Motives Behind an Earlier, Repealed Law Are Irrelevant

Defendant nonetheless asserts that "not only do courts examine the racial motivations of a law at the time of its passage, later reenactments do not cleanse the law of its original taint."  Def.'s Mot. at 20-21.  He is wrong.

First, the focus of any *Arlington Heights* analysis must be on § 1326 as enacted through the INA, not the 1929 Act or other earlier legislation.  *Arlington Heights*, 429 U.S. at 265; *supra*, § IV.A; *see also, e.g.*, *Hayden v. Paterson*, 594 F.3d 150, 165-69 (2d Cir. 2010) (considering "whether the enactment of the 1894 constitutional provision [relating to felon disenfranchisement], albeit preceded by earlier provisions that

---

[6] Defendant also cites a "radio speech" by Rep. Robert Green in January 1928, which were read into the record by another representative. *See* Def.'s Mot. at 13 (quoting Mot. Ex. F, 70 Cong. Rec. 2461 (1928)).  Even in light of his race-related comments, Rep. Green was not targeting Mexicans, but appears focused mainly on an overall strengthening of immigration law and resources.  70 Cong. Rec. 2461 (1928) (noting the "tremendous situation" facing immigration authorities, "[h]undreds of thousands of aliens cross these borders annually, thousands of whom remain in the United States," the "immigration department" employed only 2,700 people—"inadequate to cope with some 7,000,000 aliens and some 10,000 miles of border to patrol," and the burden, threat, and "economic loss," as he saw it, to public institutions).

plausibly admit of racist origins, can support an equal protection claim," and concluding that it could not—by focusing on the later, 1894 provision and that plaintiffs failed to allege any facts supporting a claim that that provision as enacted because of racial animus); *Johnson v. Governor of Florida*, 405 F.3d 1214, 1223-24 (11th Cir. 2005) (en banc) (same conclusion with respect to Florida's felon disenfranchisement constitutional provision, with focus on later-enacted provision).  Defendant overlooks the fact that a different Congress, more than 20 years later, passed the INA and brought § 1326 into law.  He has failed to show any discriminatory purpose in the INA, and any allegedly improper motives behind the 1929 Act are irrelevant to analyzing the legislative motives behind the INA and § 1326.  *See supra*, § IV.A.

Second, the hazards of inquiring into congressional motivations are at least as great when the intent of one Congress is inferred from the views of a different Congress. *See United States v. Price*, 361 U.S. 304, 313 (1960) ("the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one."); Order at 7, *Palacios-Arias*, No. 3:20-CR-62-JAG, Dkt. No. 37 ("Just as 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one,' the views of an *earlier* Congress 'form a hazardous basis for inferring the intent of' a later one." (quoting *Price*, 361 U.S. at 313)); *cf. Palmer v. Thompson*, 403 U.S. 217, 225 ("there is an element of futility in a judicial attempt to invalidate a law because of the bad motives of its supporters.  If the law is struck down for this reason, rather than because of its facial content or effect, it would presumably be valid as soon as the legislature or relevant governing body repassed it for different reasons.").

Third, the cases Defendant cites do not provide the support he claims.  In *Ramos v. Louisiana*, *see* Def.'s Mot. at 2-3, 19-21, the Supreme Court held that the Sixth Amendment requires unanimous jury verdicts to convict in federal and state cases, and it invalidated Louisiana and Oregon laws allowing convictions by non-unanimous juries. 140 S. Ct. 1390, 1392-1402, 1408 (2020).  The Court acknowledged the undisputed evidence that "race was a motivating factor in the adoption" of these states' laws, *id.* at

1394, but its analysis focused on a textual analysis of the Sixth Amendment and overruling an earlier Supreme Court decision that had permitted Oregon and Louisiana to continue their use of non-unanimous juries; the Court did not delve into or rely on the apparent motivations of the legislators enacting these jury laws, *see id.* at 1395-1402, and there was no equal protection claim, *see id.* at 1410 (Sotomayor, J., concurring in part).  And in *Espinoza v. Montana Department of Revenue*, *see* Def.'s Mot. at 20, the Supreme Court concluded that applying a "no aid" provision in Montana's constitution to bar the use of state scholarships to attend religious schools violated the Free Exercise Clause of the First Amendment.   140 S. Ct. 2246, 2251-53, 2254-63 (2020).   The majority did not rely on any "checkered tradition" underlying the no-aid provision, but instead the fundamental point that it "plainly exclude[d] schools from government aid solely because of their religious status." *Id.* at 2255, 2259.   The Court also did not address whether the no-aid provision violated the Equal Protection Clause (of the Fourteenth Amendment). *Id.* at 2263 n.5.  These two Supreme Court decisions simply do not stand for the proposition Defendant says they do.  *See also Gallegos-Aparicio*, No. 19-CR-2637-GPC, at *4-*5 (distinguishing *Ramos* and *Espinoza*); *Rios-Montano*, No. 19-CR-2123-GPC, 2020 WL 7226441, at *4 (same); Order at 6 n.7, *Palacios-Arias*, No. 3:20-CR-62-JAG, Dkt. No. 37 (same); *Lucas-Hernandez*, 2020 WL 6161150, at *2-*3 (same); *Ruiz-Rivera*, 2020 WL 5230519, at *3 (same).

### D.   Defendant Fails To Establish Discriminatory Impact or Any Resulting Discriminatory Intent

Finally, Defendant argues that § 1326 has a disparate impact and discriminatory intent based on the high percentage of Border-Patrol arrests of Mexican or Latinx individuals and other claimed subset disparities. (Def.'s Mot. at 21-23.)  Those numbers do not establish that § 1326 violates his equal-protection rights.

In Fiscal Year 2019, Border Patrol had 859,501 total encounters.  U.S. Customs and Border Protection, CBP Enforcement Statistics Fiscal Year 2021:   Total CBP Enforcement Actions, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics

(accessed Dec. 31, 2020). 851,508—99.1 percent—of those were on the southwest border of the United States. U.S. Customs and Border Protection, Southwest Border Migration FY 2019: U.S. Border Patrol Southwest Border Apprehensions FY 2019 (Nov. 14, 2019), https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019 (accessed Dec. 31, 2020). In Fiscal Year 2020, Border Patrol had 405,036 total encounters, U.S. Customs and Border Protection, CBP Enforcement Statistics Fiscal Year 2021: Total CBP Enforcement Actions, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (accessed Dec. 31, 2020), and 400,651—98.9 percent—of those occurred on the southwest border, U.S. Customs and Border Protection, Southwest Border Migration FY 2020: U.S. Border Patrol Southwest Border Apprehensions FY 2020 (Nov. 19, 2020), https://www.cbp.gov/newsroom/stats/sw-border-migration-fy2020 (accessed Dec. 31, 2020). In light of these data, it is unsurprising that a high percentage of apprehensions (and potentially prosecutions) are of Mexican or Latinx individuals.

As several courts have concluded, these data do not show disparate impact or discriminatory intent sufficient to support Defendant's equal-protection argument. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915-16 (2020) (pl. op.) (considering the disparate impact on the rescission of the DACA program on Latinx people from Mexico (who were 78 percent of DACA recipients) and concluding that it did not establish a plausible equal-protection claim: "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." (citation omitted)); *Gallegos-Aparicio*, No. 19-CR-2637-GPC, at *8 (concluding that defendant's "conten[tion] that Mexicans and other Latin Americans make up the vast majority of individuals apprehended at the border" did not "show discriminatory motive, given that the disparity is explainable on grounds other than race" (citing *Arlington Heights*, 429 U.S. at 266));

*Rios-Montano*, No. 19-CR-2123-GPC, 2020 WL 7226441, at *14-*16 (same); Order at 6 n.7, *Palacios-Arias*, No. 3:20-CR-62-JAG, Dkt. No. 37 (same); *Lucas-Hernandez*, 2020 WL 6161150, at *2-*3 (stating that disparate impact of § 1325(a)(1) "is more readily explained by the geographic proximity of the border to Mexico and Latin America than by animus"); *Ruiz-Rivera*, 2020 WL 5230519, at *4 (same).

For this additional reason, Defendant fails to show that § 1326 violates his equal-protection rights under *Arlington Heights*.

Finally, because Defendant cannot, as a matter of law, establish his equal-protection claim even under *Arlington Heights*, the Court should not hold an evidentiary hearing on his motion to dismiss. *See Irwin*, 612 F.2d at 1187.

## CONCLUSION

For the foregoing reasons, Defendant's motion should be denied.


DATED:  August 15, 2021                    Respectfully submitted,

                                           Randy S. Grossman
                                           Acting United States Attorney

                                           */s/Brandon J. Kimura*
                                           BRANDON J. KIMURA
                                           Assistant U.S. Attorney

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. Case No. 21-cr-01817-TWR |
| | ) | |
| Plaintiff, | ) | |
| | ) | CERTIFICATE OF SERVICE |
| v. | ) | |
| | ) | |
| ERICK VOSTOK BERNAL, | ) | |
| Defendant | ) | |

IT IS HEREBY CERTIFIED THAT:

I, Brandon J. Kimura, am a citizen of the United States and am at least eighteen years of age.  My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action.  I have caused service of United States' Response in Opposition to Defendant's Motion to Dismiss the Indictment on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

1. Roxana Sandoval, Esq.

Attorney for Defendant ERICK VOSTOK BERNAL

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 16, 2021.

s/*Brandon J. Kimura*
BRANDON J. KIMURA